state, because it fully conforms to the requirements of the laws of the United States, which—

" 'are laws in the several states, and just as much binding on the citizens and courts thereof as the state laws are. The United States is not a foreign sovereignty as regards the several states, but is a concurrent and, within its jurisdiction, paramount sovereignty. * * * If an act of congress gives a penalty to a party aggrieved, without specifying a remedy for its enforcement, there is no reason why it should not be enforced, if not provided otherwise by some act of Congress, by a proper action in a state court. The fact that a state court derives its existence and functions from the state laws is no reason why it should not afford relief, because it is subject also to the laws of the United States, and is just as much bound to recognize these as operative within the state as it is to recognize the state laws. The two together form one system of jurisprudence, which constitutes the law of the land for the state; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent.' " Second Employers' Liability Cases, 223 U. S. 1, 57, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44, citing Claflin v. Houseman, 93 U. S. 130, 136, 137, 23 L. Ed. 833.

The order appealed from should be affirmed. All concur.

---

(167 App. Div. 279)

### PEOPLE ex rel. NEW YORK STATE RYS. v. PUBLIC SERVICE COMMISSION, SECOND DIST. (No. 58/37.)

(Supreme Court, Appellate Division, Third Department. May 5, 1915.)

CARRIERS ☞12—FARES—STREET RAILROADS—TRANSFERS.

Where two street railroad lines run substantially parallel and 1,360 feet apart for the greater part of their distance, but one turns at right angles and crosses the other, a passenger on one of the lines is entitled to a transfer at the point of intersection to a car on the other line which will carry him back in the direction from which he came, under Railroad Law, § 181, providing that no corporation operating a street surface railroad shall charge any passenger more than five cents for one continuous ride from any point on its route to any other point thereof or any connecting branch thereof, within the limits of any city; it not appearing that there are any conditions of congestion or intricate connecting lines which render the giving of such transfers impracticable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. ☞12.]

Certiorari by the People, on relation of the New York State Railways, against the Public Service Commission of the Second District to review an order of the Commission. Order affirmed, and writ of certiorari dismissed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Kernan & Kernan, of Utica (Daniel E. Meegan, of Utica, of counsel), for relator.

Ledyard P. Hale, of Albany, for defendant.

HOWARD, J. In the city of Utica, Blandina street runs in a general easterly and westerly direction. South street is a parallel thorough-

fare 1,360 feet southerly from Blandina street, running also in a general easterly and westerly direction. On each of these streets the relator maintains a line of street railroad and operates street cars. The South Street line, at Steuben street, turns northerly at right angles and, running through other streets, intersects the Blandina Street line. The Blandina Street line from the easterly terminus to its intersection with the South Street line is about 1½ miles in length. The South Street line from its easterly terminus to its intersection with the Blandina Street line is about 1⅓ miles long. On December 19, 1910, J. L. Crandall, a resident of the city of Utica, boarded a westerly bound Blandina Street car several blocks easterly of the intersection of the two lines. He wished to proceed to a point on the South Street line at the corner of South and Steuben streets; that is, to the point where the South Street line turns from Steuben street onto South street and begins to run easterly. Crandall, at the time he paid his fare, asked the conductor for a transfer to the South Street line. The conductor refused to give him the transfer, and Crandall was obliged to pay another five-cent fare in order to reach the point of destination. Crandall made complaint to the Public Service Commission, which has resulted in an order which requires the relator to desist from collecting more than five cents for one continuous ride in either direction between any point on its Blandina Street line and any point on its South Street line; that is, in effect the railroad is required to allow a passenger to ride from any point on either line to any point on the other line for a five-cent fare, even if the passenger rides as far east as he has ridden west. This order goes beyond the facts in the case, for the passenger did not wish to return back easterly on the South Street line; his point of destination being on that part of the South Street line which runs at practically right angles with the Blandina Street line. However, it is the wish of both litigants herein that we determine the validity of the order to the same extent as though the passenger had wished to ride from the extreme easterly terminus of one line to the extreme easterly terminus of the other line.

The relator objects to issuing transfers which will carry passengers back in the direction from whence they came—back towards the starting point of the ride. This objection is based upon the contention that the passenger in such case would in effect procure, for a single five-cent fare, a round trip from the point of embarkation back practically to the same point—two trips for one fare, a result not contemplated by section 181 of the Railroad Law. The relator also bases its contention upon the ruling in Kelly v. N. Y. City Ry. Co., 192 N. Y. 97, 84 N. E. 569.

The relator contends that a resident of Blandina street, if he were given a transfer enabling him to ride back east on South street, could, by walking 1,360 feet, obtain substantially a round trip for a single fare. If there were a wide river or deep ravine, or other impassable barrier between Blandina street and South street, this contention of the relator would be obviously unsound, for then the passenger could not walk from one street to the other. If there were any impassable barrier between the two streets, and a person residing on Blandina street were denied a continuous ride for five cents to any point on

South street, the spirit of the law, which is the convenience of the public, would be defeated.  To the lame, aged, and infirm, a distance of 1,360 feet is frequently as much of a barrier as a deep gulf or impassable river.  The mere fact that a person rides back on another line in the same direction from whence he came has no particular significance.  The convenience of the public under the circumstances at hand, is a consideration of great importance which we must observe.  If this railroad is not to be burdened by strict adherence to the literal language of the statute, neither is the public to be defrauded and inconvenienced by strict adherence to the arbitrary rule that a passenger cannot, for one fare, ride back towards the starting point—a rule of the court in derogation of the statute.  Street car roads in cities are calculated for short distance rides, and it may not be possible for a person desiring to proceed from one point to another point to go directly in one direction, or even in one general direction, as he might in the case of ·a steam railroad; nevertheless, under the statute, unless the courts are to warp the statute out of shape, the railroad is not permitted to charge more than one five-cent fare for a continuous ride from one point to any other point in the city, no matter what the direction is.  It is possible for a person living midway between these two lines, in the case at bar, to walk to one line, ride to the point of transfer, enter a second car, and ride on the other line to a point opposite his residence for one fare—substantially a round trip.  But this would be unlikely to happen, except in rare instances, for what would be the object?  Picking out an improbable possibility like this in no manner militates against the wisdom and soundness of the law.

And the contention that a person might ride down town on one line, procure a transfer, do his shopping, and ride back on the other line is likewise wholly untenable.  Under the statute, the passenger is entitled only to a "continuous" ride, not to an interrupted ride, and the railroad company can easily guard against the vice of broken rides and shopping privileges by insisting that the transfer be used on the next car, or within a reasonable and limited time—five or ten minutes, perhaps, according to the frequency of passing cars.  In fact, the order of the Commission under consideration does not provide.  The stop-over, shopping privilege is not a menace; it is a myth.  ·

The statute which we are called upon to interpret in this proceeding is section 181 of the Railroad Law, which, so far as it concerns the controversy here, reads as follows:

"No corporation operating a (street surface) railroad * * * shall charge any passenger more than five cents for one continuous ride from any point on its road * * * to any other point thereof, or any connecting branch thereof, within the limits of any * * * city."

This statute appears plain and simple, and its purpose seems to be perfectly apparent, and there would be no difficulty in construing it, were it not for the ruling in Kelly v. N. Y. City Ry. Co., 192 N. Y. 97, 84 N. E. 569.  That case arose on Manhattan Island in the most densely congested section of the United States.  Kelly, the passenger in that case, boarded a south-bound car at Bayard street, in the Bowery.  He paid his fare and received a transfer, which he used on Chambers

street. At West Broadway he left the car and boarded a north-bound car, tendered his transfer, which was refused, and he was compelled to pay an additional fare of five cents in order to reach Leonard street. The point where he disembarked was about opposite the point where he had embarked; that is, he had ridden north about as far as he had ridden south. The action was brought to recover a penalty under section 104 of the Railroad Law, as it stood then. The court seemed to have in mind that an approval of the plaintiff's contention would result in wrecking the well worked out system of transferring on Manhattan Island; also the inequity which would result owing to the unique and peculiar conditions there. The following extracts from the opinion of the court indicates the tenor and scope of the decision:

"Under the regulation as made, a passenger entering a south-bound car on any of its longitudinal lines on Manhattan Island was entitled, upon payment of his fare, to receive a red transfer, which would carry him, without a further payment, to the southernmost point of its system and upon any east or west bound car of any intersecting cross-town line. If a passenger entered a north-bound car, he was entitled to a green transfer, upon which he might travel to the northernmost point of the system, with a similar right of taking any east or west bound car on cross-town lines. If a passenger entered a cross-town car, in the first instance, he was entitled to a white transfer, which, upon boarding any north or south bound car on intersecting longitudinal lines, would entitle him to receive from the conductor a red or a green transfer in exchange for his white ticket, according to the direction in which he was then bound. The limitation upon the passenger's privilege of traveling upon the defendant's car lines for one fare was that his trip must be continuous in the one general direction, as evidenced by the color of his transfer ticket. With this sole limitation, he could ride on any intersecting cross-town lines and on any of the longitudinal lines reached thereby. * * * It is manifest, however, with the enormous number of passengers carried daily to and fro upon the defendant's cars, 30 to 40 per cent. of whom are transferred, that it would be almost, if not quite, impossible by any plan, workable under congested conditions of travel, to provide for a transfer that would indicate the destination of a particular passenger, intending, in good faith, to reverse his direction of travel by taking the third side of a quadrilateral route."

Then, after arguing that public convenience is to be promoted, the opinion continues:

"That convenience has been consulted and promoted, sufficiently and, indeed, more amply, perhaps, than was essential, when the defendant, treating its railway system on Manhattan Island as a single railroad, promulgates a regulation as to transfers, which permits a passenger to travel upon any or all of its northerly or southerly lines of railway for a single fare, provided, only, that he continue in the same direction, and enables him to ride on any of the cross-town lines, which may intersect the line upon which he may happen, at the time, to be proceeding."

The extensive network of surface railroads in New York City, cross-town and longitudinal lines, and the complicated system of transfers in vogue there, renders the situation in the metropolis distinctly sui generis. Cross-town lines are so numerous there that it would seldom be necessary for a person to ride south and then back north again, or vice versa, in order to get from one point to another. It was not necessary for the plaintiff to do so in the Kelly Case. Hence a rule which might be equity there might be inequity elsewhere. The relator contends,

however, that the court intended to lay down a general rule applicable all over the state; but we think the case was decided with reference to the peculiar conditions on Manhattan Island. The section of the Railroad Law under consideration in the case at bar is not the same as the section in the Kelly Case; the facts are not at all the same. Therefore we conclude that the law of the Kelly Case is neither applicable nor controlling here.

The order of the Commission should be affirmed, and the writ of certiorari dismissed, with costs. All concur.

Determination of the Public Service Commission confirmed, with $50 costs and disbursements, and writ of certiorari dismissed.